IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAMONT LEE RHINEHART,

                Petitioner,

        vs.

M. ELIOT SPEARMAN, Warden, High
Desert State Prison,[1]

                Respondent.

No. 2:15-cv-00122-JKS

MEMORANDUM DECISION

Lamont Lee Rhinehart, a California state prisoner proceeding *pro se*, filed a Petition for a

Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Rhinehart is in the custody

of the California Department of Corrections and Rehabilitation and incarcerated at High Desert

State Prison. Respondent has answered, and Rhinehart has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On January 11, 2011, Rhinehart was charged with the murder of Avery Polk. The

information also alleged that Rhinehart personally used a deadly and dangerous weapon and had

committed the murder while engaged in the commission of rape. The information further alleged

that Rhinehart had a previous felony conviction. Rhinehart pled not guilty, denied the deadly

and dangerous weapon allegation and the special circumstance allegation, and admitted the prior

strike allegation. On January 18, 2011, Rhinehart proceeded to a jury trial. On direct appeal of

his conviction, the California Court of Appeal recounted the following facts underlying the

charges against Rhinehart and the evidence presented at trial:

---

[1]     M. Eliot Spearman, Warden, High Desert State Prison, is substituted for Heidi M.
Lackner, former Warden, Sierra Conservation Center.

## Prior to the Murder

[Rhinehart] and Avery began dating in 1998 and had a daughter together in 2001. [Rhinehart] and Avery's relationship had its ups and downs from 2005 through 2007. Avery moved into a condominium in 2007 with her daughter; [Rhinehart] did not reside with them.

On June 28, 2007, when Avery was at her sister Stephanie's house, her sister overheard Avery speaking on the phone with [Rhinehart]. According to Stephanie, Avery was angry because [Rhinehart] had answered Avery's cell phone when Steven Mitchell called her. Avery told Stephanie she wanted [Rhinehart] to start picking up her daughter from Stephanie's house to avoid [Rhinehart's] going to Avery's house.

The following evening, Stephanie spent the night at Avery's house. In the early morning hours [Rhinehart] rang Avery's doorbell. When Stephanie threatened to call the police, [Rhinehart] left.

Over the next several days [Rhinehart] repeatedly called Avery's cell phone. Phone records revealed [Rhinehart] called Avery 33 times on June 30, 2007.

Avery met Steven Mitchell at a motorcycle event in 2005. After seeing each other from time to time in 2005, Mitchell lost contact with Avery and did not reconnect until about a week before July 2, 2007. When Mitchell crashed his motorcycle on June 29, 2007, he canceled a trip to Los Angeles and made arrangements to meet Avery on July 2.

That evening, Avery cleaned her house in anticipation of Mitchell's visit. Stephanie picked up Avery's daughter and took her home to spend the night. Avery called Stephanie around 11:00 p.m. and told her that Mitchell was on his way. Avery was angry with [Rhinehart] because he kept calling her.

Mitchell arrived at Avery's condominium complex that evening. He called Avery's cell phone and she buzzed him in through the front security gate. Avery told Mitchell she would wait for him outside. After he drove in, Mitchell did not see Avery so he called her phone repeatedly.

Avery failed to respond and the calls went to her voicemail. After waiting outside for about 30 minutes, Mitchell left. He was irritated that Avery failed to show up.

On the evening in question at around 10:54, a neighbor of Avery, Lydia Soto, heard the sound of someone being chased. Soto looked outside her window and saw an African American man "rushing" another person into Avery's condo. Soto heard a woman's voice say, "'Don't beat me before I call 911.'" After the man slammed Avery's front door shut, Soto heard screaming coming from the condo.

That night, Henry Waters and Carlos Becknell were in a condominium near Avery's unit. Between 11:00 and 11:30 p.m. the two men left the condo and got into Waters' car. Waters and Becknell saw [Rhinehart] walking past the condominium's garages as they left the complex.

## After the Murder

Avery's sisters, Stephanie and Angela, did not hear from her the following day. [Rhinehart] phoned Stephanie that day, but she thought he was drunk and could not understand what he was saying.

On July 4, 2007, [Rhinehart] called Stephanie. [Rhinehart] told her he had been to Avery's condominium and that no one answered the door. Avery's sisters went to Avery's condominium to check on her. The security door and the interior door were unlocked. Inside, Stephanie and Angela found Avery's body on the floor.

After the police secured the scene, [Rhinehart] arrived. [Rhinehart] rushed toward Avery's condo and officers knocked him down to prevent him from entering. Angela kicked [Rhinehart] while he was on the ground. [Rhinehart] smelled of alcohol, and the officers detained him.

### Autopsy and Evidence from the Scene

An autopsy revealed Avery suffered several blunt force injuries to her face. Her left jaw was fractured and her arms were bruised. Avery suffered four stab wounds: two lethal and two nonlethal. One lethal wound stretched from Avery's back to her heart, hitting a lung and her liver. The other lethal wound began at Avery's hip and entered her abdomen. Two nonlethal wounds went to Avery's right breast. The autopsy could not ascertain the time of Avery's death.

Vaginal swabs taken from Avery's body revealed sperm that matched [Rhinehart's] DNA profile. Sperm matching [Rhinehart's] DNA profile was also found on Avery's underwear.

Fingernail scrapings from [Rhinehart's] right hand revealed a mixture of DNA from a major and a minor contributor. The major contributor's sample DNA profile was consistent with [Rhinehart's]; Avery was a potential minor contributor. The probability that a randomly selected African American was a minor contributor to the mixture was one in one million.

Blood found on Avery's kitchen counter matched Avery's DNA, and blood found in the kitchen sink matched [Rhinehart's] DNA. [Rhinehart's] fingerprints were found on a trash can located in the kitchen.

### Defendant's Injuries

[Rhinehart] worked as an electrician. On July 3, 2007, [Rhinehart] went to work and told his supervisor that he had injured his hand when he dropped some pipes on it. [Rhinehart's] hand was bruised and swollen. [Rhinehart] did not want to go to the doctor, so his supervisor performed basic first aid on his hand. According to [Rhinehart's] supervisor, the injury was inconsistent with the work [Rhinehart] had been engaged in.

### Uncharged Acts of Violence

In April 2004 Stephanie and Avery were preparing to leave Avery's apartment for a motorcycle event. [Rhinehart] arrived and Avery asked him to take care of their daughter for the weekend. [Rhinehart] became angry, grabbed Avery, threw her to the ground, and punched her in the face. Stephanie called 911, and [Rhinehart] threatened to return with a gun. The 911 call was played for the jury, and photos of Avery's injuries were introduced into evidence.

K.R. and [Rhinehart] were married and had a child together.  In September 1999 K.R. and [Rhinehart] had separated but met to attend either a parenting class or a court date.  When [Rhinehart] picked up K.R., he took her to his house instead of going to their appointment.  Inside the house, [Rhinehart] forced K.R. to have sex against her will.  K.R. reported the incident to the police.

Two months later [Rhinehart] went to K.R.'s house and forced her into his car.  He slammed K.R.'s head against the dashboard and drove her to his house; he dragged her inside.  [Rhinehart] had left their daughter alone in a crib in the house.  After K.R.'s mother arrived, K.R. left.

Following this incident, K.R. obtained a restraining order against [Rhinehart].  In November 1999, as K.R. was leaving work for the day, she saw [Rhinehart].  [Rhinehart] chased her, but K.R. managed to elude him.

In August 2001 K.R. was with [Rhinehart] in his home when they got into an argument.  [Rhinehart] bashed K.R.'s head into a wall.  [Rhinehart] dragged K.R. into her daughter's bedroom, punched her in the face six or seven times, and strangled her until she struggled to breathe.  K.R. identified photos showing her injuries from the attack.

### Prior Convictions

The parties stipulated that [Rhinehart] had been convicted of misdemeanor domestic violence for the November 8, 1999, incident against K.R. and felony domestic violence for the incident against K.R. on August 2, 2001.  (§ 273.5.)  [Rhinehart]was also convicted of a felony for the incident involving Avery on April 20, 2004.  (§ 273.5.)

### Defense Case

[Rhinehart] presented eyewitness identification testimony by psychologist Geoffrey Loftus, an expert in memory and perception.  Professor Loftus testified that memory changes over time.  In addition, people can develop memories that are not accurate.

[Rhinehart's] mother testified that [Rhinehart] always wore his hair very short or was bald.  [Rhinehart] never wore dreadlocks or cornrows.  [Rhinehart] lived with her and was usually home in the evenings.

An expert in forensic blood pattern analysis described the blood patterns found in the kitchen and on a wall outside the kitchen in Avery's condo.  In the expert's opinion, the blood evidence on the wall and in the kitchen area was not cast-off blood.

*People v. Rhinehart*, No. C067952, 2013 WL 3729160, at *1-3 (Cal. Ct. App. July 15, 2013).

At the conclusion of trial, the jury found Rhinehart guilty of first-degree murder as charged in Count 1.  The jury also found true that Rhinehart personally used a deadly and dangerous weapon in the commission of the murder and that he committed the murder while he engaged in the commission of rape.  The trial court subsequently found Rhinehart ineligible for

probation and sentenced him to life imprisonment without the possibility of parole. The trial court did not impose an additional sentence based on Rhinehart's prior strike because it would have been moot.

Through counsel, Rhinehart appealed his conviction, arguing that: 1) the court erred by a) admitting evidence of uncharged acts against Avery and K.R., b) admitting Avery's statements made prior to the murder, and c) excluding evidence of K.R.'s drug sales conviction; 2) the court abused its discretion in denying Rhinehart's mistrial motions based on the court's evidentiary errors; 3) the trial court made a number of errors with respect to the jury instructions; 4) the court erred in sentencing because the felony-murder special circumstance failed to narrow the class of person subject to it compared to other murder defendants; 5) the existence of cumulative error warranted reversal of his conviction; and 6) the court erred in ordering Rhinehart to pay attorney fees. On July 15, 2013, the California Court of Appeal issued a reasoned, unpublished opinion striking the order imposing attorney fees but otherwise unanimously affirming the judgment against Rhinehart. *Rhinehart*, 2013 WL 3729160, at *17. Rhinehart petitioned the California Supreme Court for review of his unsuccessful claims, which was summarily denied on October 16, 2013.

While his appeal was pending, Rhinehart filed in the superior court a *pro se* petition for habeas relief. In that petition, Rhinehart claimed that: 1) trial counsel was ineffective for a) allowing the prosecutor to proceed with the case despite a lack of evidence, b) failing to challenge his detention, c) failing to challenge the law enforcement's failure to provide a polygraph examination for Rhinehart, d) failing to investigate third party culpability, and e) failing to obtain evidence that K.R. committed perjury; 2) the prosecution of the case

improperly focused on him as the sole suspect; and 3) the prosecutor committed misconduct by coercing a witness to identify Rhinehart at the scene of the crime. On September 14, 2011, the superior court issued a reasoned, unpublished opinion dismissing some claims on procedural grounds and denying others on the merits.

Rhinehart then filed a *pro se* petition for habeas relief in the Court of Appeal, in which he argued that the prosecutor knowingly presented tainted evidence and misleading documents. The petition was denied without comment on August 28, 2014.

Rhinehart timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on October 21, 2014. *See* 28 U.S.C. § 2244(d)(1)(A). Briefing is now complete, and the case has been reassigned to the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Rhinehart argues that: 1) the trial court erred in admitting other bad acts evidence; 2) the court erred in denying his motion for a mistrial based on the erroneous admission of other bad acts evidence; 3) the court erred in precluding him from impeaching prosecution witness K.R. as to certain prior convictions; 4) the court erred in admitting the victim's statements as hearsay exceptions to show her state of mind; 5) the court erred in failing to instruct the jury on third party culpability; 6) the court's instruction on special circumstance felony murder was deficient; 7) the jury instructions on burdens of proof were conflicting; 8) the court erred in giving the jury a consciousness of guilt instruction; 9) the felony-murder special circumstance was unconstitutionally applied; 10) the cumulative effect of the errors warranted reversal of the judgment; and 11) the court erred in ordering Rhinehart to

pay attorney's fees without substantial evidence of present ability to pay or evidence of the actual amount of such fees.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.    <u>Evidentiary Errors</u> (Grounds 1-4)

Rhinehart first challenges his conviction by alleging a number of evidentiary errors. The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In this context, the Supreme Court has defined the

category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights. *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67). Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission of certain evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). The "[a]dmission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it." *Boyde*, 404 F.3d at 1172 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus).

1.     *Admission of prior crimes* (Grounds 1, 2)

Rhinehart contends that the trial court erred in admitting his uncharged conduct against

Avery and K.R.  On direct appeal of his conviction, the Court of Appeal laid out the following

facts underlying this claim:

> During in limine motions, the prosecution requested rulings on a variety of prior
> acts by [Rhinehart]: (1) on April 30, 2004, [Rhinehart] beat Avery in her sister's
> presence; (2) in 2004 Avery's cousin spent the night at Avery's house and awoke to the
> sound of someone slapping Avery; (3) on July 30, 2001, [Rhinehart] slammed K.R.'s
> head against the wall and on August 2, 2001, punched her in the head and face; (4) on
> November 24, 1999, [Rhinehart] chased K.R. as she left work; (5) on November 8, 1999,
> [Rhinehart] forced K.R. into his car and hit her in the face, after which K.R. obtained a
> restraining order against [Rhinehart]; and (6) on September 7, 1999, [Rhinehart] raped
> K.R.
>
> Defense counsel objected to the admission of these prior uncharged acts on both
> constitutional grounds and under Evidence Code section 352.  The trial court ruled all of
> the incidents were admissible.[FN2]
>
> > FN2.   The court stated the 2004 slapping incident was admissible if the
> > prosecution provided an adequate foundation.  Avery's cousin testified
> > about the incident, but the court struck her testimony because the
> > prosecution failed to provide a sufficient foundation.

*Rhinehart*, 2013 WL 3729160, at *4.

California Evidence Code § 1108 allows the prosecution to prove a defendant's

propensity to commit sex crimes by offering evidence that he has committed other sex crimes.  It

is an exception to the general rule, reflected in § 1101, that propensity evidence is not

admissible.  *See* CAL. EVID. CODE §§ 1101(a), 1108(a).  The relevant portion of § 1108 provides:

"In a criminal action in which the defendant is accused of a sexual offense, evidence of the

defendant's commission of another sexual offense or offenses is not made inadmissible by

Section 1101, if the evidence is not inadmissible pursuant to Section 352."  Section 1108 is

analogous to Federal Rule of Evidence 413, which provides that, "[i]n a criminal case in which a

defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault." FED. R. EVID. 413(a).

Rhinehart contends that the evidence should have been excluded under California Evidence Code section 352, and the inflammatory nature of the evidence violated his federal right to a fair trial. Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

To the extent Rhinehart argues that the trial court erred under state law, he cannot prevail on such claim because, again, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987). So, even if the trial court erred in its application of §§ 352, 1101, and 1108, such error is not a ground for federal habeas relief. *See Estelle*, 502 U.S. at 67-68.

Moreover, the Ninth Circuit has repeatedly barred federal habeas petitioners from challenging the constitutionality of prior sexual misconduct evidence admitted to show

propensity pursuant to California Evidence Code § 1108.  *See, e.g., Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("Ninth Circuit precedent 'squarely forecloses [the] argument' that admission of evidence of sexual misconduct to show propensity violates due process.") (quoting *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)); *Sanches v. Hedgpeth*, 381 F. App'x 710, 711 (9th Cir. 2010) ("[T]he Supreme Court has never held that the admission of prior sexual misconduct to lend credence to a victim's claims to be unconstitutional."); *Mejia*, 534 F.3d at 1046 (on AEDPA review, upholding admission of evidence of prior uncharged sexual offenses in support of rape charges).  Thus, the admission of the alleged sexual offenses did not violate due process because it is permissible for a jury to infer a petitioner's propensity to commit a sexual offense from prior sexual offenses.  *See United States v. LeMay*, 260 F.3d 1918, 1025 (9th Cir. 2001) ("[C]ourts have routinely allowed propensity evidence in sex-offense cases . . . . In many American jurisdictions, evidence of a defendant's prior acts of sexual misconduct is commonly admitted in prosecutions for offenses such as rape, incest, adultery, and child molestation."); *United States v. Mound*, 149 F.3d 799, 801 (8th Cir.1998) (determining that, under Rule 413 of the Federal Rules of Evidence, the introduction of prior sexual offenses to demonstrate a defendant's propensity to commit the charged sexual offense does not constitute a violation of due process).

Moreover, the United State Supreme Court has left open the question of whether state law would violate the Due Process Clause if it permitted the use of prior crimes evidence to show propensity to commit a charged non-sexual offense.  *Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").  As such,

the Ninth Circuit has routinely found federal habeas relief to be foreclosed by § 2254(d)(1) for claims challenging the admission of evidence of prior bad acts or crimes even outside of sexual offenses. *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006). Lacking any clearly established Supreme Court authority prohibiting admission of such evidence, it cannot be concluded that the appellate court's ruling contravened or unreasonably applied federal law. *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable). In the absence of clearly established Supreme Court law on this issue, AEDPA relief is foreclosed. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law") (citation, internal brackets and quotations omitted). Because the state courts' rejection of this claim was not contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court, Rhinehart's challenge to the admission of evidence of prior conduct must fail.

2. *Limitation on cross-examination of K.R.* (Ground 3)

Rhinehart additionally argues that, to impeach witness K.R., he had a right to admit all

prior convictions and not just those that directly related to her honesty.  The Court of Appeal

considered and rejected this claim on direct appeal as follows:

> Defense counsel sought to admit K.R.'s prior convictions for impeachment
> purposes. K.R.'s prior convictions consisted of (1) a 1995 conviction for possession of
> cocaine for sale, (2) a 2000 misdemeanor check fraud conviction, (3) a 2006
> misdemeanor possession of a controlled substance conviction, and (4) a 2007
> misdemeanor theft conviction.
>
> The trial court allowed impeachment with the check fraud conviction and the
> misdemeanor theft conviction.  However, the trial court excluded the possession of a
> controlled substance conviction because it was not a crime of moral turpitude.
>
> The court also found inadmissible the 1995 possession of cocaine for sale, finding
> it too remote in time.  The court reasoned: "[O]n [K.R.], I'll allow the [Penal Code
> section] 484 misdemeanor conviction and the [Penal Code section] 475 misdemeanor
> conviction.  Those are clear, straight-up crimes that involve truth-telling, and obviously
> they are admissible, but they are comparatively minor conduct, and it doesn't, in the
> Court's mind, refresh an 11351.5 felony conviction [under the Health and Safety Code],
> which is in this moral turpitude category, and so I will foreclose that."
> . . . .
>
> A witness's conviction of a crime may be used to impeach that witness.
>  However, the trial court may exercise its discretion under Evidence Code section 352 to
> exclude a conviction when its probative value is exceeded by the risk of undue prejudice.
> In making this determination, the court considers whether the conviction reflects on
> honesty and the remoteness of the conviction.  We review the court's decision to exclude
> or admit a conviction for an abuse of discretion.
>
> Here, the trial court allowed K.R.'s impeachment with a 2000 check fraud
> conviction and 2007 theft conviction, but did not admit the 1995 conviction for
> possession of cocaine for sale or the 2006 conviction for possession of a controlled
> substance.  The convictions admitted cast doubt on K.R.'s credibility and were of fairly
> recent vintage.  The 1995 drug conviction was considerably older and would have merely
> reinforced the already tarnished image of K.R.'s ability to tell the truth.  We conclude
> there was no abuse of discretion in the court's decision not to admit the drug conviction.

*Rhinehart*, 2013 WL 3729160, at *6 (citations omitted).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him . . . ." U.S. CONST. amend. VI.  It is well settled that, under the Sixth Amendment, an

accused has the right to present witnesses, testimony and other evidence in his defense.  *See*

*Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not have an

unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible

under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).  States have

considerable latitude under the Constitution to establish rules excluding evidence from criminal

trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or

limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the

issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the

rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th

Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due

process rights are not violated by exclusion of relevant evidence where probative value is

outweighed by danger of prejudice or confusion).

Again, to the extent Rhinehart appears to challenge the California Court of Appeal's

determination that, as a matter of California law, K.R.'s conviction for possession of a controlled

substance did not involve a crime of moral turpitude and her 1995 conviction for possession of

cocaine for sale was too remote, the Court is bound by the Court of Appeal's conclusion that the

trial court did not err as a matter of California law in excluding the evidence.  *See Bradshaw*, 546

U.S. at 76 (state court's interpretation of state law, including one announced on direct appeal of

the challenged conviction, binds a federal court on habeas review).

Nor can Rhinehart show that the exclusion of this evidence violated his federal

constitutional rights to present a defense and to confrontation.  It was not objectively

unreasonable for the California Court of Appeal to conclude no constitutional violation had occurred.  Here, Rhinehart cannot show that he was denied his right to present a defense because the excluded evidence was cumulative of other trial evidence that the defense used to attack K.R.'s credibility, including her other admitted convictions.  The evidence therefore had "little importance" and did not outweigh "the state's interest in efficient judicial process."  *See Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).  Likewise, Rhinehart fails to show that his rights to confrontation were violated because the defense was able to strenuously attack K.R.'s credibility, giving the jury sufficient information to appraise her possible motives.  *See Skinner v. Caldwell*, 564 F.2d 1381, 1388 (9th Cir. 1977).  Given the relative insignificance of K.R.'s conviction for simple drug possession and the remoteness of the possession of cocaine for sale conviction, they would not have produced a significantly different impression of her credibility.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  Rhinehart is not entitled to relief on these claims.

3.      *Admission of hearsay* (Ground 4)

Rhinehart further argues that the trial court erred in admitting Avery's statements as evidence of her state of mind.  On direct appeal, Rhinehart argued that the statements were "unreliable and largely hearsay evidence from biased witnesses on which the defense had no opportunity to cross-examine the declarant."  The Court of Appeal considered and rejected his argument as follows:

> The prosecution sought to admit several statements Avery made before her death.  Defense counsel objected and the trial court allowed counsel to "federalize" the objections.  The court found most of the statements admissible under Evidence Code section 1250 as evidence of Avery's state of mind.
> Subsequently, the prosecution introduced several of Avery's statements at trial.  Avery's sister Angela testified that on June 28, 2007, prior to the murder, Avery told her

she was angry with [Rhinehart] for answering her phone. Avery said she was "ready to just leave it alone," meaning her relationship with [Rhinehart].

Angela also testified that later, when she and Avery were in the car, [Rhinehart] called Avery. [Rhinehart] offered Avery money, which she turned down. Avery told [Rhinehart] she "'didn't want to be bothered'" by him. Avery told Angela she was going to shop for cleaning supplies to clean her house for company she was expecting that evening. Later that evening, Avery called her sister and told her [Rhinehart] was "continuously" calling her phone. To Angela, Avery appeared nervous, but she was also excited about the company she expected that evening.

Another of Avery's sisters, Stephanie, also testified that on June 28, 2007, Avery was upset with [Rhinehart] for answering her phone. Stephanie overheard Avery on the phone with [Rhinehart], cursing him and asking why he answered the phone when Mitchell called her. Avery asked [Rhinehart], "'Why are you obsessing about Steve [Mitchell]?'" Avery told [Rhinehart] she did not want him to bother her anymore, and she would no longer be present when they exchanged custody of their daughter. She told Stephanie that she had put [Rhinehart's] belongings in one of her cars so he could retrieve them.

Stephanie spent the night at Avery's house on June 29, 2007. Stephanie testified that [Rhinehart] knocked on Avery's door at 4:40 the next morning. Avery asked Stephanie to tell him she was asleep.

Stephanie testified that [Rhinehart] called Avery on June 30. Avery told [Rhinehart] she would not attend a barbecue with him. She also told Stephanie she was not going to fall for [Rhinehart's] tricks and that she was done with him. On July 1 Stephanie heard Avery tell [Rhinehart] to stop calling her. On Monday, July 2, Avery told her sister that Mitchell was on his way to her home. Avery said [Rhinehart] "won't stop calling."

The court instructed the jury regarding Avery's statements: "From this witness and from other witnesses, you are going to hear a lot of statements that [Avery] made, and these statements can be considered for very special purposes under the law. A statement such as 'I don't want to see this person anymore,' you can consider that as a direct statement she made about her mind, her state of mind, and you can consider that, whether or not that is true, and how it fits in with all of the other evidence you will receive. [¶] Other statements she makes are not about the emotions she is feeling or her state of mind at the moment, but they are about facts that she relates from which you might draw inferences about her state of mind. For example, 'He called me multiple times,' or 'I am going to have a visitor this evening.' Those statements cannot be considered for the truth of the matter asserted; that is, whether or not she is going to have a visitor that night or not, or whether or not he even called many times. [¶] But you can consider that, given the whole, it gives you some inference, some circumstantial evidence as to what her state of mind is. So you can't consider it for the truth of the matter asserted that she was really going to have a visitor that night, but you can consider it as to what her state of mind might be if she stated that in terms of wanting other guests or not, for example, okay? [¶] Do you understand that admonition?"

. . . .

[Rhinehart] argues the evidence should have been excluded under Evidence Code section 352, since it was coming from "angry family members and a declarant whom the defense had no opportunity to confront[;] the evidence here was indeed misleading and unfair." The prosecution exacerbated the unfairness, [Rhinehart] contends, by arguing this proved [Rhinehart] was the jealous nighttime attacker.

The court found Avery's statements admissible under Evidence Code section 1250. Section 1250 provides an exception to the hearsay rule for statements of a declarant's state of mind. Such statements are admissible when offered to prove the declarant's state of mind when it is itself in issue or the evidence is offered to prove or explain acts or conduct of the declarant.

[Rhinehart] contends Avery's statements were "recent generic anecdotes from [sic] weakly reflected no more than a 'transitory' [citation] state of mind in an up and down relationship that included ongoing shared child custody issues." We disagree.

During closing arguments, defense counsel argued Avery and [Rhinehart] engaged in consensual sex before another person murdered Avery. Avery's statements that she did not want [Rhinehart] to call her anymore and that she was done with him revealed a state of mind contrary to the portrait of a compliant Avery that defense counsel sought to paint. As such, these statements were highly probative. The prejudicial impact of the statements was minimal. Therefore, the trial court did not err in admitting them.

*Rhinehart*, 2013 WL 3729160, at *7-8 (citations omitted).

Again, to the extent that Rhinehart's claim is based upon an alleged violation of

California Evidence Code § 1250, such claim is not cognizable on federal habeas review.

Whether a statement constitutes hearsay is a question of state law that this court may not revisit.

*See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *cf. Lilly v. Virginia*, 527 U.S. 116, 125 (1999)

(plurality opinion) (whether statements qualified as statements against penal interest for purposes

of state hearsay rule is a "matter of state law").

Moreover, Rhinehart cannot show that the state court's ruling was contrary to, or an

unreasonable application of, clearly established federal law. Rhinehart appears to argue the

admission violated his due process rights because the testimony was not sufficiently relevant to

outweigh its prejudicial impact. But as laid out in that court's thorough analysis of this claim,

the Court of Appeal reasonably concluded otherwise. *See Estelle*, 502 U.S. at 70 (holding that,

as a general matter, the admission of evidence "relevant to an issue in the case" does not violate due process). Indeed, even if the state court's conclusion was incorrect, such erroneous conclusion would still not warrant relief as the United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation." *Holley*, 568 F.3d at 1101; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006) (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'").

Nor can Rhinehart show that the admission violated his right to confrontation. The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides in part that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. However, the Confrontation Clause applies only to "testimonial" statements, which generally refers to "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *See Crawford v. Washington*, 541 U.S. 36, 50-51 (2004). Although the Supreme Court has not articulated a comprehensive definition of testimonial hearsay, it has concluded that statements to friends and neighbors are not testimonial. *See Giles v. California*, 554 U.S. 353, 376 (2008); *Crawford*, 541 U.S. at 51 (Confrontation Clause addresses formal statements of a declarant to government officers because that person "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"); *see also Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008) (finding that "the state court's implicit conclusion that [the victim's] remarks to her coworkers did not implicate [the petitioner's] Sixth Amendment rights of confrontation" was not contrary to, nor an unreasonable application of, *Crawford*). Thus, the victim's statements did

not implicate Rhinehart's right to confrontation, and Rhinehart cannot show either a confrontation or due process violation.

B.    <u>Instructional Errors</u> (Grounds 5-8)

Rhinehart additionally avers that the trial court made a number of errors with respect to the instructions issued to the jury. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw*, 546 U.S. at 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson*, 431 U.S. at 155. In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

1.    *Third party culpability* (Ground 5)

Rhinehart first argues that the court erred in refusing to instruct the jury on third party culpability, and should have allowed the defense to argue that Mitchell killed Avery. At trial, the court ruled that defense could not argue that Mitchell murdered Avery:

> There are credible points that in most instances may support that it was someone else, for example, with the knife that it could have been a double edged knife and my

21

client didn't have a double edged knife.  [¶]  You may argue that if you want; therefore, it is probably someone else.  You can do that.  You just can't say, therefore, it was Mr. Mitchell.

*Rhinehart*, 2013 WL 3729160, at *10.

A criminal defendant "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63; *Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002).  However, failure to instruct on a defense theory constitutes reversible error only "'if the theory is legally sound and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (citations omitted).

Here, Rhinehart has not shown that the trial court erred when it declined the requested third party culpability instruction, and therefore he fails to meet his "especially heavy" burden of establishing that omission of the instruction so infected the entire trial that he was deprived of his constitutional right to a fair trial.  *Kibbe*, 431 U.S. at 155.  To the contrary, the requested third party culpability instruction was largely duplicative of CALJIC 2.90, the instruction the trial court gave the jury on reasonable doubt and the presumption of innocence.  *See People v. Hartsch*, 232 P.3d 663, 692 (Cal. 2010) (third party culpability instructions "add little to the standard instruction on reasonable doubt"); *People v. Wright*, 755 P.2d 1049, 1055 (Cal. 1988) (CALJIC 2.90 sufficiently instructs the jury on issues of third party culpability).  As such, Rhinehart was not denied the due process of law when the trial court rejected the third party culpability instruction.  *See United States v. Del Toro-Barboza*, 673 F.3d 1136, 1147 (9th Cir. 2012) ("Although a defendant may ask the court to instruct the jury on his theory of defense, and should get a suitable instruction if the theory is supported by law and some evidence, a court

may reject a defendant's requested instruction if other instructions reasonably cover the theory of the defense."); *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) (per curiam) (It "is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory." (citation and internal quotation marks omitted)).

Moreover, the evidence Rhinehart cites was simply not sufficient to warrant giving a third party culpability instruction. As the Court of Appeal concluded on direct appeal:

> At trial, the evidence established that on the night of Avery's murder, Mitchell arrived at her condominium complex. He spoke with Avery by cell phone and she buzzed him in. After Mitchell drove into the complex, he did not see Avery, so he called her 10 to 15 times. When Avery did not answer, Mitchell's calls went to voicemail. Mitchell waited for Avery for half an hour but left, irritated, when she failed to show up.
>
> [Rhinehart] argues the evidence that Mitchell, not [Rhinehart], committed the murder "was easily sufficient to raise a reasonable doubt of [Rhinehart's] guilt. " The circumstantial evidence included Mitchell's presence at the scene, opportunity, motive, and matching a physical description and Mitchell's injuries. According to [Rhinehart], "These lines of circumstantial proof were similar to those offered against [Rhinehart]." In addition, [Rhinehart] contends, the court's error in foreclosing defense counsel from arguing the evidence could point to Mitchell as the assailant seriously compounded the instructional error.
>
> Here, the evidence revealed Mitchell had the opportunity to kill Avery and a possible motive for killing Avery, his anger that she failed to show up for their meeting. However, evidence of mere motive or opportunity for Mitchell to kill Avery does not raise a reasonable doubt about [Rhinehart's] guilt. [Rhinehart] must also provide direct or circumstantial evidence linking Mitchell to Avery's killing. We find [Rhinehart's] efforts to provide such evidence unconvincing.
>
> According to [Rhinehart], since Avery might have been killed by a double-edged weapon, Mitchell's status as a biker links him to the crime. During closing argument, defense counsel noted the connection between motorcycle groups and "weapons of double bladed variety."
>
> The evidence showed Avery's stab wounds might have been inflicted by a double-edged weapon, but the injuries also might have been caused by a kitchen knife. Moreover, [Rhinehart] failed to connect motorcycle enthusiasts with double-edged weapons. This failure renders his argument speculation, not circumstantial evidence.
>
> [Rhinehart] also reiterates his argument that Mitchell lied about being injured during a motorcycle accident to disguise the fact that the injuries were incurred during the murder. Defense counsel argued Mitchell testified he injured his left wrist, but an

investigator testified the injury was to the right wrist.  According to defense counsel, Mitchell lied because the left side of Avery's face was battered.

We agree with the trial court's assessment of this evidence.  The court noted: "you certainly can't reach an inference that because the gentleman has an injury on one side of his body as opposed to the other . . . that that is direct evidence or circumstantial evidence that connects him as the person who is actually a perpetrator of the crime."

None of this evidence provided direct or circumstantial evidence that Mitchell killed Avery.  Instead, [Rhinehart] provides speculation as to the provenance of the weapon and a possible motive.  Evidence of mere motive or opportunity to commit the crime, without more, is not sufficient to raise a reasonable doubt about [Rhinehart's] guilt.

*Rhinehart*, 2013 WL 3729160, at *10-11.

The Court of Appeal's determination is both reasonable and fully supported by the record.  Rhinehart is therefore not entitled to relief on this claim.

2.      *Felony-murder special circumstance* (Ground 6)

Rhinehart next alleges that the trial court failed to fully instruct on the felony-murder special circumstance allegation, which requires that a felony cannot be incidental to the murder. Rhinehart argued on direct appeal that the CALCRIM instruction given "does not appear to properly convey the non incidental requirement; instead, it conveys misleading technical intent requirements and excludes the core objective non-incidental element."  The Court of Appeal considered and rejected this claim as follows:

The court instructed with CALCRIM No. 730: "The defendant is charged with the special circumstance of murder committed while engaged in the commission of rape in violation of Penal Code section 190.2(a)(17).

"To prove that this special circumstance is true, the People must prove that:

"1. The defendant committed rape;

"2. The defendant intended to commit rape;

"3. The defendant did an act that caused the death of another person;

"and

"4. The act causing the death and the rape were part of one continuous transaction.

"To decide whether the defendant committed rape, please refer to the separate instructions that I will give you on that crime. You must apply that instruction when you decide whether the People have proved this special circumstance.

"The defendant must have intended to commit the felony of rape before or at the time of the act causing the death."

"In addition, in order for the special circumstance to be true, the People must prove that the defendant intended to commit rape independent of the killing. If you find that the defendant only intended to commit murder and the commission of rape was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."

. . . .

[Rhinehart] argues "concurrent intent to kill and commit another felony is not automatically enough, as suggested by the second-to-last sentence in the instruction, if the felony is not independent of the killing [citation]; and, further, that the conjunctive 'and' in the final sentence dispenses with the objective non-incidental felony element, which is the crux of the special circumstance, as a separate element. Taken together, these two sentences convey a bare independent intent element, which applies to any felony-murder, instead of the objective non-incidental element that is the crux of the special circumstance."

Despite [Rhinehart's] effort to find confusion and perplexity, the instruction given plainly and simply informed the jury that it must find [Rhinehart] intended to commit the underlying rape separately from forming the intent to kill in order to find the felony-murder special circumstance applicable.

To prove a felony-murder special-circumstance allegation, the prosecution must show defendant possessed an independent purpose for committing the felony, not merely an intent incidental to an intended murder. If the felony is merely incidental to achieving the murder, then the special circumstance is not present. However, if the defendant had an independent felonious purpose, such as robbery or rape, and commits the murder to advance that independent purpose, the special circumstance is present. The instruction given adequately described the conditions necessary for the felony-murder special circumstance to apply.

*Rhinehart*, 2013 WL 3729160, at *12 (citations omitted).

The California Court of Appeal's conclusion is both reasonable and fully supported by the record. Rhinehart cites no federal law disapproving of the use of such instruction under these circumstances. Even if he could show state law error, which does not appear from the record, again, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6

(1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."). Likewise, this Court is bound by the state appellate court's determination that the trial court was not required under California law to give a different instruction, in the absence of any due process violation. Rhinehart fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted). Thus, Rhinehart is not entitled to relief on this instructional error claim either.

        3.     *Burden of proof* (Ground 7)

Rhinehart additionally contends that the instructions given to the jury on burdens of proof were conflicting and failed to distinguish the lesser standard of proof needed to establish the prior conduct from the greater standard of proof applicable to the ultimate propensity and guilt inference. According to Rhinehart, the instructions suggested that the prior conduct is sufficient to support a conviction if the jury finds the conduct true beyond a reasonable doubt. The Court of Appeal considered and rejected this claim as follows:

> During jury instruction discussions, the trial court found it had a sua sponte duty to instruct with CALCRIM Nos. 852 and 1191. Defense counsel stated it was requesting the instructions.

CALCRIM No. 852 states: "The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the charged crimes. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes and allegations. The People must still prove the charges and each allegation of every charge beyond a reasonable doubt."

The court, pursuant to CALCRIM No. 1191, instructed:

"The People presented evidence that the defendant committed the crime of rape against [K.R.] that was not charged in this case. This crime is defined for you in these instructions.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the crime of rape, as alleged/charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of rape. The People must still prove the charges and allegations beyond a reasonable doubt."

In addition, the court instructed on the reasonable doubt standard pursuant to CALCRIM No. 220:

> "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.
>
> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."
>
> Finally, the court instructed with CALCRIM No. 224, which states, in part: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."
>
> . . . .
>
> The court instructed the jury that it could find [Rhinehart] guilty of the charged crimes only if the prosecution proved the charges beyond a reasonable doubt. We presume jurors are capable of both understanding and applying the court's instructions on applying the various standards of proof.
>
> The Supreme Court in *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford* ) entertained a similar challenge to the predecessor of CALCRIM No. 1191, CALJIC No. 2.50.01. After considering the instruction, the court determined no reasonable juror would believe a conviction could be based solely on the uncharged offense. The instruction stated that proof of the uncharged offenses was not sufficient alone to prove the defendant's guilt of the charged crimes beyond a reasonable doubt. No reasonable juror would conclude that the lower standard of proof applicable to the uncharged offense would apply to the proof of the charged offenses.
>
> As in *Reliford*, the instructions given in the present case informed the jury that proof of the uncharged offenses alone could not be used to prove [Rhinehart's] guilt of the charged crimes beyond a reasonable doubt. In light of the instructions given, no reasonable juror would assume the lower standard of proof applied to the uncharged offenses sufficed to meet the burden of proof on the charged offenses.

*Rhinehart*, 2013 WL 3729160, at *13-14 (citations omitted).

Rhinehart fails to demonstrate that he was denied a fair trial. In making that determination, "[t]he jury instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72. Based on the Court's review of the instructions and the trial record as a whole, this Court agrees with the appellate court that there is no basis to conclude that there was any defect with the jury instruction here. As the appellate court found, the jury instructions, as given in their

entirely, properly informed the jury as to the appropriate burdens of proof to apply. There is no reasonable likelihood that the instructions were applied in a way that violated the Constitution. *Estelle*, 502 U.S. at 72.

3.    *Consciousness of guilt* (Ground 8)

Rhinehart further alleges that the court erred in instructing the jury, over defense counsel objection, on the consciousness of guilt instruction in CALCRIM No. 362 based on Rhinehart's false statement. This claim was considered and rejected on direct appeal as follows:

> The prosecution requested CALCRIM No. 362 based on [Rhinehart's] statements to his supervisor that he hurt his hand working on pipes. Defense counsel objected, arguing, "I don't think the testimony supports that. [¶] Mr. Henning in particular when asked to testify explained his training had absolutely no way of—my opinion, of making a determination as to the degree of the injury suffered." Defense counsel termed Henning's testimony "weak."
>
> The trial court overruled the objection, stating: "The issue, of course, is for the jury to decide whether or not those were false statements to Mr. Henning. [¶] The instructions are drafted so that any reasonable alternative is instructed for. One reasonable alternative is that Mr. Henning's assessment was accurate and the statement was false. [¶] I think the alternative theory is probably valid as well because this is an oral expression like an explanation of shock, or feigned crying that probably qualifies as well. But the Henning incident is clear, more on point, justifies the instruction."
>
> The court subsequently instructed: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." . . . .
>
> A trial court properly instructs on consciousness of guilt where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions. Such an instruction is proper if there is some evidence in the record to support the inference.
>
> Consciousness of guilt may be inferred from a defendant's false or misleading statements made to arresting officers or others for the purpose of misleading or allaying suspicion. Rhinehart argues it was improper to give the instruction, which penalized a statement "that is just as likely to have been in good faith as to have been deliberately false or misleading."

At trial, [Rhinehart's] supervisor, Michael Henning, testified [Rhinehart] came to work on July 3, 2007. [Rhinehart] told him he had injured his hand by dropping pipe on it. Henning, who had experience with construction injuries, looked at the injury, and in his opinion, the injury was not caused by a pipe dropping on it. According to Henning, [Rhinehart's] injury was not "conducive [sic] to the task he was performing."

Henning acknowledged it was possible for [Rhinehart] to have injured his hand at work. However, Henning reiterated that, in his opinion, [Rhinehart's] injury did not correspond to the type of work he was performing.

[Rhinehart] argues the court should not have instructed jurors that [Rhinehart's] statement to Henning could be considered a false statement "because the statement was just not manifestly false or manifestly internally inconsistent." We disagree.

Avery sustained severe injuries to her face consistent with someone's having punched her. Third-party testimony placed [Rhinehart] at Avery's condominium complex late in the evening of July 2, 2007. This evidence sufficiently supported the inference that [Rhinehart] lied about his injuries to Henning to conceal the fact that he had injured his hand striking Avery the previous evening. We find the trial court's decision to give CALCRIM No. 362 supported by the record.

*Rhinehart*, 2013 WL 3729160, at *14-15 (citations omitted).

As discussed above, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even universally condemned,' but must violate some due process right guaranteed by the fourteenth amendment." *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988). Here, Rhinehart argues that the instruction on consciousness of guilt should not have been read to the jury because there was no evidence that Rhinehart lied about his injury. However, as the California Court of Appeal determined, there existed evidence from which the jury reasonably could conclude that Rhinehart made false or misleading statements. Accordingly, there was a sufficient basis for the trial court to give the jury instruction, and the California Court of Appeal reasonably relied on such evidence to deny Rhinehart's claim.

Moreover, as the trial court noted, "[t]he issue, of course, if for the jury to decide whether or not those were false statements to Mr. Henning. The instructions [were] drafted so that any reasonable alternative [including that the statements were not false] [were] instructed for."

*Rhinehart*, 2013 WL 3729160, at *15.  Given the lack of any indication that the jury did not follow this admonition, or that the jury understood the instructions to mean that they were required to find that petitioner had a consciousness of guilt, it cannot be said that the instructions "so infected the entire trial that the resulting conviction violate[d] due process."  *Prantil*, 843 F.2d at 317.  Accordingly, Rhinehart is not entitled to relief on this ground..

C.      <u>Sentencing Errors</u> (Grounds 9, 11)

Rhinehart further alleges two claims related to his sentencing.  The constitutional guarantee of due process is fully applicable at sentencing.  *See Gardner v. Florida*, 430 U.S. 349, 358 (1977).  However, state law sentencing errors are not cognizable on federal habeas review.  *See Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989).  Moreover, as the Ninth Circuit has explained, a petitioner's contention that a state trial court improperly exercised its discretion under state sentencing law generally does not allege any cognizable claim for federal habeas relief.  *See Brown v. Mayle*, 283 F.3d 1019, 1040 (9th Cir. 2002), *vacated on other grounds*, 538 U.S. 901 (2003), remanded to 66 F. App'x 136 (9th Cir. 2003).  Nevertheless, a federal court may vacate a state sentence imposed in violation of due process, for example, if a state trial judge enhanced a sentence based on materially false or unreliable information or based on a conviction infected by constitutional error.  *See  Townsend v. Burke*, 334 U.S. 736, 741 (1948); *United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995); *Walker v. Endell*, 850 F.2d 470, 477 (9th Cir. 1987).

1.      *Felony-murder special circumstance* (Ground 9)

Rhinehart first argues, as he did on direct appeal, that the court applied the felony-murder special circumstance, Penal Code § 190.2, unconstitutionally because it failed to narrow the class

of persons subject to it as compared to other murder defendants. The Court of Appeal rejected the claim under binding state law. *Rhinehart*, 2013 WL 3729160, at *15 (citing *People v. Pollock*, 89 P.3d 353, 380 (Cal. 2004)). Moreover, the United States Supreme Court has never sustained a constitutional challenge to § 190.2 and has specifically rejected the argument that it is unconstitutionally vague. *See Tuilaepa v. California*, 512 U.S. 967, 975-80 (1994). In the absence of explicit direction from the Supreme Court, this Court cannot say that the decision of the California Court of Appeal in this case was contrary to, or involved an unreasonable application of the relevant Supreme Court decisions. *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).

       2.    *Erroneous restitution order* (Ground 11)

Rhinehart also challenges the court's restitution order. A petition for a writ of habeas corpus can be entertained only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a habeas corpus petition raising an in-custody challenge to a restitution order." *Bailey v. Hill*, 599 F.3d 976, 984 (9th Cir. 2010) (footnote omitted). "[T]he remedy that [Petitioner] seeks, the elimination or alteration of a money judgment, does not directly impact—and is not directed at the source of the restraint on—his liberty." *Id.* at 981. A federal court, then, lacks jurisdiction to hear claims that challenge the money portion of a state judgment, such as a restitution order, which does not affect the duration of custody. *Id.* Accordingly, Rhinehart is not entitled to relief on this ground.

D.    <u>Cumulative Error</u> (Ground 10)

Rhinehart further claims that the cumulative effect of the above errors warrants relief. "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294. As discussed throughout this opinion, however, Rhinehart does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Accordingly, Rhinehart is not entitled to relief on his cumulative error claim either.

E.  <u>Prosecutorial Misconduct/Ineffective Assistance of Counsel</u> (Ground 12)

Finally, Rhinehart argues that the prosecutor committed misconduct by presenting false evidence to the jury and that his trial counsel was ineffective for failing to object. Rhinehart raised this claim in his state habeas petitions, in which he argued that prosecution witness K.R. lied by denying methamphetamine use, the prosecutor knew the testimony was false, and defense counsel "allowed" the prosecutor to use it.

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any

reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted). The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001). Thus, if Rhinehart successfully shows that the prosecutor knowingly elicited perjured testimony material to his case, habeas relief may be warranted.

Although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Rhinehart's contention that the prosecution knowingly introduced the perjured testimony of K.R. Indeed, Rhinehart has failed to show by way of admissible, competent evidence that K.R. perjured herself at trial by denying methamphetamine use. Although Rhinehart attaches to his petition what appears to be a 2010 minute order from another civil case that K.R. "tested positive for meth," it does not prove false K.R.'s trial testimony on cross-examination denying that she was under the influence of methamphetamine on particular dates and during specific incidents. Because Rhinehart fails to show that K.R.'s testimony was false, he cannot show that the prosecutor committed misconduct with regard to that testimony. For the same reason, Rhinehart cannot demonstrate that counsel was ineffective for failing to object to the testimony. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996) (defense counsel's failure to raise a meritless argument or to take a futile action does not constitute ineffective assistance of counsel). Rhinehart is not entitled to relief on this ground.

F.     Request to Expand the Record

Rhinehart requests that the Court "get all records pertaining to all of the records in Superior Court, Third District Court of Appeals, and United States Eastern District Court." Respondent has lodged the records from the state court with this Court, and the Court is therefore in possession of the records Rhinehart references.

Rhinehart additionally "request[s] that [the] Court request copies from petitioner's investigator Bill Deasy."  The Court construes the request as a motion to expand the record under Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts. As discussed above, federal habeas claims are analyzed under the framework of the AEDPA, 28 U.S.C. § 2254.  In *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).  *See id.* at 187 n.11 ("[Petitioner] has failed to show that the [state court] unreasonably applied clearly established federal law on the record before that court, which brings our analysis to an end.") (internal citations omitted).  In *Runningeagle v. Ryan*, 686 F.3d 758, 773-74 (9th Cir. 2012), the Ninth Circuit explained that *Pinholster* governs discovery, expansion of the record and evidentiary hearings.  Thus, *Pinholster* bars a habeas court from any further factual development unless the court first determines that the state court made an unreasonable application of federal law or made an unreasonable determination of facts based on the record before it.  *Pinholster*, 563 U.S. at 202 n.20.  As discussed throughout this opinion, Rhinehart has failed to make a

threshold showing that the state court made an unreasonable application of federal law or made an unreasonable determination of facts based on the record before it. Although Rhinehart avers that "[d]uring [Deasy's] investigation he found out that [Rhinehart] did not commit any crime," Rhinehart provides no facts or evidence in support. Accordingly, the request to expand the record must also be denied.

## V. CONCLUSION AND ORDER

Rhinehart is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request to expand the record is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 2, 2017.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge